1        UNITED STATES DISTRICT COURT

2          DISTRICT OF SOUTH DAKOTA

3            SOUTHERN DIVISION
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
4                        Cr. 17-40078

5  UNITED STATES OF AMERICA,

6              Plaintiff,

7      -vs-

8

9  KEVIN JAY MAST,

              Defendant.
10
                        U.S. Federal Courthouse
11                       Sioux Falls, SD
                         April 9, 2018
12                       10:00 a.m.
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
13            PUBLIC TRANSCRIPT OF
              SENTENCING HEARING
14
      (PURSUANT TO STANDING ORDER 16-04, PORTIONS OF ALL
15  CHANGE OF PLEA AND SENTENCING TRANSCRIPTS ARE RESTRICTED)
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
16
   BEFORE:   The Honorable Karen E. Schreier
17            U.S. District Court Judge
              Sioux Falls, SD
18
   APPEARANCES:
19
   Mr. Jeffrey C. Clapper
20  Assistant U.S. Attorney
   PO Box 2638
21  Sioux Falls, SD 57101-2638
                        for the Plaintiff
22
   Mr. Gary R. Leistico
23  Rinke Noonan
   Suite 300, US Bank Plaza
24  1015 West St. Germain Street
   St. Cloud, MN 56301
25                       for the Defendant
   PRESENT:  Defendant Kevin J. Mast

INDEX TO WITNESS

Witness          Direct   Cross   Redirect     Recross

PLAINTIFF'S


DAVID AZURE       5          16
    By the Court - p. 18

INDEX TO EXHIBITS

                          OFFERED            RECEIVED


GOVERNMENT'S


Exhibit 1                   6                    6
(Fish and Wildlife Wetland Restoration
Plan, 2-9-2018)


Exhibit 2                   15                   15
(Aerial photograph taken 11-19-2017)

1          * * * * *  APRIL 9, 2018  * * * * *

2          (In open Court, counsel and Defendant present,

3     at 10:00 a.m.)

4          THE COURT:  This is the time scheduled for a

5     sentencing in the matter entitled United States of

6     America vs. Kevin Jay Mast.

7          Would counsel please note their appearances

8     for the record.

9          MR. CLAPPER:  Jeff Clapper on behalf of the

10    United States.

11         MR. LEISTICO:  Good morning, Your Honor.

12    Gary Leistico on behalf of Mr. Mast.

13         THE COURT:  Mr. Leistico, did you have a

14    chance to review the Presentence Report with your

15    client?

16         MR. LEISTICO:  We have, Your Honor.

17         THE COURT:  There were a number of

18    objections.  It looked to me like the report was

19    amended to address all of them?

20         MR. LEISTICO:  I believe that's correct.

21         THE COURT:  And the Government had no

22    objections?

23         MR. CLAPPER:  Correct, Your Honor.

24         THE COURT:  There is an instance where

25    there's not an advisory guideline range.

1        The maximum sentence that could be imposed

2  is up to 180 days in custody.  A period of supervised

3  release can be imposed of up to one year.  The

4  Defendant could be placed on probation for a period up

5  to five years.

6        The fine range is a maximum of $10,000.

7  Restitution has been requested in the form of a change

8  to the area to protect the wetlands.  The special

9  assessment is $10.

10        Counsel, do you both agree?

11        MR. CLAPPER:  Yes, Your Honor.

12        MR. LEISTICO:  Yes, Your Honor.

13        THE COURT:  I did review the Defendant's

14  sentencing memorandum and the victim impact statement.

15        Let's take up the wetland restoration plan

16  first with regard to the restitution that's been

17  requested.

18        MR. CLAPPER:  Your Honor, with regard to

19  that issue, I would like to offer some testimony from

20  Dave Azure.

21        THE COURT:  All right.

22

23        DAVID AZURE,

24  called as a witness, being first duly sworn, testified as

25  follows:

DIRECT EXAMINATION

BY MR. CLAPPER:

Q.    Please state your name.

A.    David Anthony Azure.

Q.    Who do you work for?

A.    I work for the United States Fish and Wildlife
Service.

Q.    What's your position there?

A.    I am currently a wildlife refuge manager at
Sand Lake National Wildlife Refuge.

Q.    You testified at the trial in this case?

A.    That's correct.

Q.    Since the verdict was rendered, has the Fish and
Wildlife Service drafted a restoration plan in this case?

A.    Yes, we have.

Q.    Who did you gather input from in coming up with
the restoration plan?

A.    We worked with the staff from the Madison Wetland
Management District.  I consulted a publication out of
Minnesota called the Minnesota Wetland Restoration Guide,
produced by the Minnesota Board of Water and Soil
Resources, and talked to the engineer that drafted that
publication, as well as a gentleman by the name of Ray
Finnochiaro.

        Ray was formerly a wetland ecologist for the

1    United States Geological Survey out of Northern Prairie

2    Wildlife Research Center in North Dakota.

3    Mr. Finnochiaro has done quite a bit of research on drain

4    tile, wetlands obviously, and has worked with us in the

5    past on other wetland easement cases.

6        Q.   Based on gathering information from all of those

7    people, the restoration plan submitted to the Court is

8    what your office ultimately concluded on?

9        A.   That's correct.

10            MR. CLAPPER:  Your Honor, I would offer

11   Government Exhibit 1.

12            THE COURT:  Any objection?

13            MR. LEISTICO:  If it is the restoration

14   order that is attached to the victim impact report,

15   then I would have no objection, Your Honor.

16            MR. CLAPPER:  It is.

17            THE WITNESS:  Mr. Clapper, it would be more

18   accurate to say we prepared a draft plan, and then had

19   those two gentlemen look at that plan for their

20   feedback and input on it.

21            THE COURT:  It does appear to be the same

22   document that was attached to the victim impact

23   statement.  Exhibit 1 is received.

24   BY MR. CLAPPER:

25       Q.   Mr. Azure, when you submitted this draft plan to

1    some of the outside consultants, Mr. Finnochiaro, for

2    example, did they have some concerns about the plan as

3    drafted?

4    A.   Both gentlemen expressed minor concerns about the

5    plan, both of them from a different perspective.

6          Mr. Finnochiaro, for example, had some concern

7    that the tile that would remain adjacent to or in

8    proximity to Wetland No. 2, I think it's Wetland No. 2 on

9    the very north side of the easement tract, he thought

10    there might be some residual lateral effect of the tile

11    that remained in the ground, thinking it may intercept

12    water that would ultimately end up in the protected

13    wetland if it were not there.

14          Based on my knowledge of the site and based on

15    consultation with the staff at Madison, we didn't think

16    that that was a substantial risk.

17    Q.   Of course Mr. Finnochiaro hasn't been to the

18    site.  Has he?

19    A.   He was at the site years ago when this case first

20    came to light, and we were investigating another

21    restoration technique.

22    Q.   Ultimately you decided on the restoration plan

23    that's described in Exhibit 1 and depicted on the last

24    page of Exhibit 1.  Is that right?

25    A.   That is correct.

1    Q.  I'm going to show you on the screen the last

2    page.  Can you describe, with making references to this

3    photograph, what the restoration plan entails?

4    A.  So this restoration plan entails rendering the

5    tile lines inoperable beginning near the downstream side

6    of each protected wetland area.  By rendering inoperable,

7    I mean the removal of approximately 150 feet of the tile

8    and then backfilling with the fill material and

9    compacting that in.

10    Q.  Would you also recommend capping off the ends?

11    A.  Sure, yes.  I think there are 10 tile breaks

12    there.  Each tile block would require two ends to be

13    capped in one fashion or another, and that can be

14    accomplished a couple different ways.

15    Q.  Wouldn't a different option be just to remove all

16    of the tile that was placed there?

17    A.  That is an option.  Actually that was our

18    restoration recommendation initially in this case, and

19    it's how we treated every easement violation prior to

20    about 2015.  When we had tile that was placed beneath

21    wetlands, beneath protected wetland areas, we would ask

22    the land owner to remove all the tile beneath the wetland

23    out to a distance of what we calculated the lateral

24    effect of that tile to be.

25    Q.  Why are you not recommending that in this case?

1    A.    We learned through a prior case, from

2  Mr. Finnochiaro actually, that there's a potential to do

3  more damage to some of these wetland areas by excavating

4  the drain tile, especially when tile systems are

5  extensive.

6        Before that prior case, many of our violations

7  only involved one or two tile lines beneath protected

8  wetland areas.  In the prior case, it was in Hamlin

9  County, there were some of those wetlands with extensive

10  tile systems beneath relatively large wetlands, and to

11  excavate all of that tile in his estimation would have

12  done significant damage to the wetlands themselves.

13    Q.    Is it your understanding to remove the tile, you

14  have to dig in from above the surface every place one of

15  these lines are located?

16    A.    Yes.  That's my understanding, that you have to

17  excavate that tile to remove it.

18    Q.    So your plan proposed by Fish and Wildlife

19  Service here is not to do that, but just to remove

20  portions downstream from each of the six areas?

21    A.    That is correct.

22    Q.    Why do you think that will work or be effective

23  at restoring the wetland areas?

24    A.    Again, relying, in part, on the publication out

25  of Minnesota, which prescribes tile blockage or tile

removal, as I've described here, as a restoration

technique.  We have also utilized this technique now a

few times since 2015.

Q.   In South Dakota?

A.   In South Dakota.

Q.   In fact, that's what the two pages prior to the

last page indicate.  I'll show you, I think it's Page 4

is a diagram of a property in Hamlin County with tile

lines inserted.  Is that right?

A.   That is correct.

Q.   Then the blue section indicates where the tile

lines were removed?

A.   That's correct.

Q.   Then the other tile remained in the ground, but

was capped off?

A.   That is correct.

Q.   Then the next page after that says "restored

wetlands."  Can you tell the Court what happened after

the restoration occurred?

A.   The restoration was in the spring of 2016.  I

stopped by that particular tract through the rest of 2016

a couple different times.  In the fall of 2016 I did

start to notice some surface water ponding in the wetland

area to the upper right, very shallow.

In 2017, if you remember, it was a relatively dry

year most of the year.  We did receive some precipitation

throughout the year, however, and by November 2017 these

two wetlands, in particular, were ponding water.

Q.    So from the Fish and Wildlife perspective, was

this considered a successful restoration?

A.    Yes, it was.

Q.    Is one of the benefits to the landowner, if you

take this approach to restoration, a reduced cost?

A.    Absolutely.

Q.    Why is that?

A.    Well, it's less time on the excavator, if you

have to hire a contractor and use equipment.  In this

particular case, about 900 feet of tile was removed, as

opposed to if you remove all of that tile would have been

substantially more expense just in that regard.

        We also have been investigating a technique --

we're trying to develop a technique using expandable foam

where we can just access the tile in one spot and inject

a foam compound that will completely occlude the tile

lines.

Q.    Have you looked into that option for the Mast

property?

A.    Not seriously, because it's been our experience

that we have a difficult time getting the cost down.  For

example, in this particular case that's shown on the

1    screen, the estimated cost of foaming those lines for the

2    150 feet was about $10,000.  It was much more economical

3    just to hire a contractor with a trackhoe to excavate and

4    remove the 150-foot sections.

5        Q.    Any idea what the estimated cost on the Mast

6    property would be to use expandable foam to plug the

7    lines?

8        A.    Just the 150 feet or to completely fill in?

9        Q.    Completely fill in.

10       A.    I just eyeballed it.  I would estimate -- it's in

11   the neighborhood of 6,000 linear feet of tile beneath

12   these protected wetland areas.  If you use the previous

13   estimates from the Hamlin County case and extrapolate

14   that out, it could be in the neighborhood of $65,000 to

15   $70,000.  That's just a rough approximation.

16       Q.    Would expandable foam be less intrusive than even

17   the restoration plan proposed in Exhibit 1?

18       A.    Far less intrusive.  We would only need one

19   access point, theoretically, per tile line.  We're still

20   working on the technique.  But we believe we can deliver

21   the foam through the use of a trolley system that we

22   would develop to get that wand down the tile line to

23   start to inject the foam.

24       Q.    But the plan in Government Exhibit 1, while

25   somewhat intrusive to the, I'll call it, downstream area,

1    would be more cost-effective?

2        A.    It would be more cost-effective.

3        Q.    For the landowner?

4        A.    For the landowner.

5        Q.    Of course, your proposal in Government Exhibit 1

6    for the restoration plan is for the landowner to incur

7    the expense of the restoration?

8        A.    That is correct.

9        Q.    Any idea what the restoration would cost for the

10   plan proposed in Government Exhibit 1?

11       A.    I believe the estimate within the plan is $4,000.

12       Q.    How about the timing of that plan?  When could

13   this be completed as proposed?

14       A.    As soon as conditions are dry, dry enough to

15   allow equipment on top, without excessive damage in the

16   form of trenches, and then dry enough to excavate the

17   material and get it packed back in.

18       Q.    One of the details in the restoration plan, as I

19   noticed, was there's a difference in the soil to be

20   excavated.

21       A.    That is correct, yes.

22       Q.    So their proposal is for some care to be taken in

23   separating the topsoil from the sub-topsoil.  Is that

24   right?

25       A.    That's right, yes.

1    Q.   That would be needed to be done at each

2   excavation site?

3    A.   That is correct.

4    Q.   Are there any other concerns about the proposal

5   for this property?

6    A.   There was concern expressed by Mr. Wenzel, the

7   author of the Minnesota Restoration Guide, about Wetland

8   Area No. 1.

9    Q.   Wetland Area No. 1 is in the northwest corner,

10   and on the photo from Exhibit 1, there's a blue line up

11   there?

12    A.   Yes.

13    Q.   Is that what you're referring to?

14    A.   Yes.

15    Q.   What does the blue line represent on this plan?

16    A.   That is an option we included in the restoration

17   plan for there to be nonperforated tile routed around

18   Wetland Area No. 1, tying back into the tile system below

19   the tile block.

20    Q.   That's not something Fish and Wildlife is

21   proposing.  They're just saying it's an option for

22   Mr. Mast.

23    A.   That's correct.

24    Q.   It wouldn't be necessary for the restoration of

25   this property for that to happen?

1    A.    No.

2    Q.    If you don't do that, though, does it -- then it

3    could just be as-is without that blue line?

4    A.    Yes.  That's correct.

5    Q.    And the cost for that nonperforated line, that

6    would be in addition to the $4,000 estimate or so?

7    A.    Yes, it would.

8    Q.    Have you had a chance to observe the property as

9    it sits now?

10   A.    I have, yes.

11   Q.    I'm going to show you Government Exhibit 2.  What

12   is that?

13   A.    This is an aerial photo taken by Anna Anderson on

14   November 19, 2017.  Miss Anderson is a pilot for the

15   United States Fish and Wildlife Service.

16   Q.    This is an aerial photograph taken over the same

17   area of land?

18   A.    That is correct.

19        MR. CLAPPER:  Your Honor, I move for the

20   admission of Government Exhibit 2.

21        THE COURT:  Any objection?

22        MR. LEISTICO:  No objection, Your Honor.

23        THE COURT:  2 is received.

24   BY MR. CLAPPER:

25   Q.    Showing you Government Exhibit 2 on the screen.

This again was November of 2017?

A.   That is correct.

Q.   So six, seven months ago, approximately?

A.   Yes, sir.

Q.   Even as the conditions exist as depicted in Government Exhibit 2, the plan that's proposed by Fish and Wildlife in Government Exhibit 1, it's your position that those wetland areas in Areas 1 through 7 could be restored?

A.   Yes, it is.  We're hopeful they can be.

MR. CLAPPER:  Thank you.  I don't have any more questions.

THE COURT:  Mr. Leistico?

MR. LEISTICO:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LEISTICO:

Q.   Good morning, Mr. Azure.  On Government Exhibit 1 with the restoration, so as the restoration plan with the red areas, there are ten areas where the proposal is to take the tile out, which would be the tile that's downstream of what you've determined is a wetland area. Is that correct?

A.   Yes.  It's on the downstream side of each wetland area.

Q.   So the concern that we would have is that -- I'll

1   start my questioning as to the exhibit with this other

2   property, the Hamlin property.  You're aware of that.

3       A.   I am.

4       Q.   And on that, it appears that the tile that was

5   placed into those basins essentially just were tiled

6   within the basin.  Do you agree with that?

7       A.   Yes, sir.

8       Q.   But on the Mast property, it appears that the

9   tile is also placed upstream from the basin, and then the

10  tile goes through the basin, and it is blocked where the

11  tile then leaves the basin.  Is that correct?

12      A.   Each wetland area is slightly different in terms

13  of where the tile is placed.

14      Q.   But you would agree that the tile on the Mast

15  property does include areas outside of the wetland,

16  as well.

17      A.   Some of them do.  That's correct.

18      Q.   The concern, and would you agree with this, is

19  that because the wetland is at the downgrade of the tile

20  that is basically upgrade of the wetland, that water then

21  that wouldn't otherwise enter the wetland, it may enter

22  the wetland through the tile, and then be held in that

23  basin because the downstream tile is now removed.  Do you

24  see what I mean?

25      A.   Kind of, but each wetland area is slightly

1  different, and in most situations it is my belief that

2  what you just said is inaccurate, because that water

3  would end up in those wetland areas.

4      The tile is placed within the contributing

5  watershed of the wetland areas in most instances.  So

6  it's just taking water and expediting its delivery to

7  those wetland areas.

8      Q.  But the water would otherwise get there, so the

9  removal of the upstream tile wouldn't alter that wetland

10  area?

11      A.  Yes, sir.  Only it would deliver that water a

12  little bit quicker and in a little bit different fashion.

13      Q.  The tile would?

14      A.  It would.

15      MR. LEISTICO:  Thank you.  I have no other

16  questions, Your Honor.

17      THE COURT:  So the map, as it's drawn on

18  Page 7 of Exhibit 1, would that restore the wetlands

19  to the now existing or recurring due to natural causes

20  as of 1973?

21      THE WITNESS:  I'm assuming you are looking

22  at the restoration plan with the tile blocks on it?

23      THE COURT:  Right.

24      THE WITNESS:  Our goal with the restoration

25  plan is to restore the area back to how it was prior

1    to the tile being installed.

2           So with respect to the capacity of each

3    wetland to pond water, it really doesn't take into

4    consideration the water budget of each wetland area,

5    if that makes sense.

6           So, yes, prior to 2013, prior to 1973, in

7    this instance is the same.

8           THE COURT:  Okay.  So the time -- 2013's

9    status quo at that point would be comparable to how it

10   was in 1973?

11          THE WITNESS:  Untiled, yes.

12          THE COURT:  Untiled.

13          THE WITNESS:  Yes.  When we use pre-2013,

14   pre-1973, untiled is what we're after.

15          THE COURT:  Okay.  And the option of adding

16   in the blue nonperforated is because of the fact that

17   the landowner to the west put in tile, and it would

18   allow that water to go through that blue area and then

19   exit the property?

20          THE WITNESS:  It would.  Mr. Finnochiaro, in

21   particular, expressed concern about what he terms

22   "tile blowouts" with hydraulic pressure.

23          Depending on the extensiveness of the tile

24   system to the land to the west and how much water

25   comes down that line, if it hits a block and has

1  nowhere to go, there's a potential for it to blow out,

2  for lack of a better term.

3  THE COURT:  Okay.  Any other questions,

4  Mr. Clapper?

5  MR. CLAPPER:  No, Your Honor.

6  THE COURT:  Mr. Leistico?

7  MR. LEISTICO:  None, Your Honor.

8  THE COURT:  You can be excused.  Thanks.

9  (Witness excused)

10  THE COURT:  Any other witnesses?

11  MR. CLAPPER:  No, Your Honor.

12  THE COURT:  Mr. Leistico, any witnesses?

13  MR. LEISTICO:  No, Your Honor.

14  THE COURT:  Why don't I hear from

15  Mr. Leistico first, since I think Mr. Clapper is just

16  going to say that this plan should be adopted.  Is

17  that a fair summary?

18  MR. CLAPPER:  That's fair, Your Honor.

19  THE COURT:  Mr. Leistico?

20  MR. LEISTICO:  Your Honor, first of all,

21  we're here presented for sentencing.

22  Regardless of what the Court orders on the

23  restoration plan that's been submitted, Mr. Mast is

24  prepared to follow the Court order.  He does have

25  concern with the restoration order and has been

working with Fish and Wildlife for some time, as the Court is aware.

As to this particular restoration plan, I think the Court's questions to Mr. Azure right at the end were very on point with the concern. He indicated they did not do a water budget. They're assuming the conditions in 2013 are exactly what they were in 1973 with no basis.

I think at the trial there was ample evidence, which is where the idea of the blue nonperforated line came in the northwest, that there's additional water. That's water that, under South Dakota law, it's a civil law rule. It's a natural swale that's entering his property.

It's questionable he could stop that landowner from allowing that water to outlet onto his property, whether he wanted to or not.

It certainly wasn't water that was on the site in 1973. That was put in, that tile to the west, about in 2013 at the time that Mr. Mast placed his tile.

If the Agency is simply not taking that into consideration, other changes on the site, there was ample evidence at the trial, I believe, as well, in the southwest corner of the property, going into

what's been depicted as Wetland Area No. 3, which was
never touched by Mr. Mast, and that water then enters
wetland Area No. 3, and then doesn't allow Wetland
Area 4 to drain as well as it used to, Wetland 5,
Wetland 6, Wetland 7, which is the natural drain, and
I believe there is fairly conclusive evidence that the
Wetland 3 does drain to the northeast.

So it all backs that up, which I
fundamentally believe is the reason Mr. Mast did the
tiling. This had never been done before. It was that
there was both tile from the south, southwest, west,
and northwest.

I think the Agency should take that into
consideration in forming a water budget, so that the
site is what it was in 1973, substantially different
in 2013.

I can't argue that the 150-foot tile break
below the wetlands is the standard under the Board of
Water and Soil Resources in Minnesota, the BWSR, as to
how they restore wetlands.

But unlike the example in the Hamlin matter
that is part of Exhibit 1, there is tile that is
outside and upstream of the wetlands. Mr. Azure
testified that it will change the timing and the way
the water gets into these wetlands, so it will be a

1    bottleneck.

2          So at a minimum, we do ask that the Agency

3    go back and do a water budget, and have more

4    discussions with the Agency on the restoration plan,

5    as proposed.

6          But that regardless of the restoration plan,

7    that it doesn't stop Mr. Mast from removing the tile

8    that is outside of the wetland areas, but upstream of

9    those.  Because right now it's -- I mean these were

10    placed with the idea that it would move the water

11    through the basins, downstream, and off the property.

12          But by just blocking the bottom, and it's

13    all a matter of cost, but that he be allowed -- the

14    testimony from Mr. Azure in questioning by Mr. Clapper

15    was that the soil profile would be removed, with the

16    topsoil being removed, and then the undersoil being

17    placed back in that order.  So they have the more

18    organic soil on top.  We understand that.

19          But that as to those wetlands, if they start

20    to pool, that he not be limited by Court Order now to

21    continue to allow those areas to pool without any

22    relief in removing that tile that's upstream from

23    those wetlands.  Mr. Mast believes that will be a

24    concern.

25          I think it would be a tradeoff matter, if

1    the Court orders restoration, as to whether it would

2    be cost-effective to do that.

3          But as Mr. Azure indicated, that water is

4    going to get to those wetlands, anyhow.  It doesn't

5    need the tile.  The tile would be artificial.

6          That Mr. Mast be, at least, allowed the

7    opportunity to take that into consideration as to any

8    restoration, and that he should be able to put

9    perforated tile or some other mechanism to allow water

10   that is now entering from manmade causes.  It's not

11   natural existing at the time.  It's not naturally

12   recurring.

13         This is something that's substantial

14   acreage.  I believe there's testimony, but my

15   recollection is it was well over a hundred acres or

16   more of additional land being tiled into the property,

17   and that is something he has no relief to move, and

18   yet isn't part of the easement which he respects.

19   He'll do whatever the Court orders him to do, but we

20   would ask this restoration order not be approved, as

21   submitted, based on the comments and the testimony,

22   Your Honor.

23         THE COURT:  Mr. Clapper?

24         MR. CLAPPER:  Well, Your Honor, we're asking

25   the restoration plan, as proposed in Government

Exhibit 1, be approved by the Court.

The objections by the defense are very vague, and he's offered no counterproposal to try and deal with restoring any of the wetland areas to the condition they were in prior to the time he installed the drain tile.

The plan submitted by the Government is a reasonable one. It's a cost-effective one for the Defendant, and it's the least disturbing, not quite the least disturbing, but less disturbing than removing all of the tile.

If we want to go back to status quo, previous to his time of installing the drain tile, we'd just rip it all out. Then he will suffer the consequences of dealing with extra runoff from some of his neighbors.

If the Court is contemplating something other than the plan as proposed in Exhibit 1, I think we need some more details about it, Your Honor.

But this plan, as proposed, is a reasonable one and an effective one, based on other places that this method has been used to restore the wetlands.

THE COURT: So if Mr. Mast wanted to remove more of the tile line than what's marked in red, would you have an objection to him being able to do that if

he followed the correct protocol on replacing the
soil?

MR. CLAPPER:  I think we would want to know
where as to each line.  I think the plan, as proposed,
is designed to try and not disturb any of the
designated wetland areas.

If the tile line proposed, in addition to
the red lines, is not in those areas, I don't think
Fish and Wildlife would have any objection to that.

Without seeing a specific proposal as to
what it is, we have some concerns about removing,
versus trying to re-route, some of that water, too.

THE COURT:  So, Mr. Leistico, does your
client have specific areas that he has identified
where he might want to remove more of the tile line?

MR. LEISTICO:  Thank you, Your Honor.  And I
appreciate Mr. Clapper's comments about having a
detailed plan.

Based on the time of this trial and the
conditions on site, it takes a fair amount of fair
weather, unfrozen ground, to complete a water budget,
so we don't have that.

As to -- we don't know that there's going to
be artificial, additional ponding because of the other
tile on those sites.  It may be that the cost would be

so excessive that if there is additional ponding, it's
not offset by the cost of taking the tile.

But as to the areas identified, and
specifically in 1, you can see there's a large amount
of tile that would then be blocked off.  If the Court
recalls from the testimony, the elevations in that
part of the property were quite severe.

So all of the other tile in 1 would end up
stopping right where the yellow dot.  In fact, all of
the yellow dots are where the water from that tile
would be.

On the Hamlin property, that tile is, not
completely, but almost completely within areas of just
that basin.  Some of the tile, like in Wetland 4 and 5
and 7 and 6, there's extensive tile outside of those
areas.

I don't think it would be a matter of
violation of the easement if he would take tile
upstream out, just like he's doing downstream.  At
least he would have that option if it would be a
problem.  It sounds like the Government doesn't have
an objection if he follows the soil protocol, which we
understand, for sure within those basin areas, which
is where their easement applies.

The biggest concern of all the water on the

site is coming from the southwest into Area 3.  That
is simply being blocked, and he is held harmless
basically against his neighbors -- or they're held
harmless against him.  The Government is asking for a
Court Order that he can't ever do anything about that
water.

I've worked with many cases with U.S. Fish
and Wildlife Service where they have recognized that
additional water.  I wouldn't see the harm in having
that recognized here.  There would be a number of
variety of ways that could be done without removing
the hydrology within these seven basins.

THE COURT:  So, Mr. Clapper, is U.S. Fish
and Wildlife the only entity that would have to
approve any changes to the restoration map?

MR. CLAPPER:  Yes, Your Honor.  It's their
easement.

THE COURT:  If the Court adopted this
restoration plan, subject to changes mutually agreed
upon, between U.S. Fish and Wildlife and Mr. Mast, is
that acceptable?

MR. CLAPPER:  I'm not in the practice of
doing this, Your Honor, so I'm just trying to
contemplate the worst case scenarios.

The worst case scenario is we don't agree,

1     the parties disagree, and they have to come back here.

2          So to the extent it contemplates coming back

3     here to deal with unresolved disputes, I don't have a

4     problem with that.

5          THE COURT:  Mr. Leistico?

6          MR. LEISTICO:  Thank you.  I wasn't clear if

7     Mr. Clapper wants an outcome that wouldn't allow for

8     the parties to come back here if they can't agree, or

9     if Mr. Mast is okay -- as long as that's the worst

10    case scenario, that the Court would be the final

11    determiner then.  I was just unclear of your position.

12         MR. CLAPPER:  So if I understand what the

13    Court is saying, the plan, as proposed, anything

14    outside of this would have to be agreed to by the

15    parties.

16         THE COURT:  Right.

17         MR. CLAPPER:  If it's not agreed to, it

18    either won't happen, or we'll have to come back to the

19    Court for that to be decided.

20         THE COURT:  Right.  So I would view it, if

21    you don't agree, you have to comply with the plan.  I

22    would assume at that point if Mr. Mast wanted someone

23    else to weigh in on it, he would make the motion to

24    have the Court consider his alternative.

25         I would think Fish and Wildlife wouldn't be

making the motion.  It would be Mr. Mast.

MR. CLAPPER:  Okay.  I don't have an objection to that.

MR. LEISTICO:  I would prefer that over mutually agree as the only basis, because then if they didn't agree, we would be without remedy.  So I would appreciate that.

I do think NRCS would have to approve for the nonperforated at least on the southwest.  There may possibly be a county ordinance that could apply, but I don't know that, as I stand here now.

NRCS, I think they could be satisfied, but it would have to be contemplated, and we would do that, as well.  He has an independent obligation, and we have a certified wetland determination.

So if it didn't touch those areas, then there would be no sign-off needed from NRCS.  But if it did touch those areas, they would have to sign that off.  They typically do that in the normal course. We'd go through that process.  Thank you.

THE COURT:  So I just wanted to make sure that if there were other approvals that needed to be made, that Mr. Mast gets those.  I don't want to say anything today that would indicate that it's just Fish and Wildlife if NRCS also has to sign off on

1   something.

2         MR. LEISTICO:  No, I appreciate that.  I

3   expect that the Court's Order here is not ordering

4   them to have to comply with it if Fish and Wildlife

5   does.  He understands any other government, state, or

6   federal requirement, he would do that independently.

7         THE COURT:  Okay.  So my suggestion would be

8   that I would indicate that Mr. Mast has to comply with

9   the restoration plan, subject to changes agreed upon

10  between U.S. Fish and Wildlife and Mr. Mast, and if

11  the parties are not able to agree, the Court will be

12  the final arbiter.

13        Is that acceptable to both sides?

14        MR. CLAPPER:  Yes, Your Honor.

15        MR. LEISTICO:  Yes.

16        THE COURT:  Okay.  That's the restitution

17  that I will order then.  Mr. Clapper?

18        MR. CLAPPER:  Your Honor, the other issue

19  regarding that has to do with timing.  I would request

20  a deadline be placed on completing the plan, as

21  proposed.

22        THE COURT:  What deadline do you have in

23  mind?

24        MR. CLAPPER:  June 1 of this year.

25        THE COURT:  Mr. Leistico?

1    MR. LEISTICO:  Thank you, Your Honor.  If

2    the Court orders it, he will do his best to complete

3    the restoration order.

4         I think, in good faith, there could be an

5    attempt to have it done by June 1st.

6         I would ask for a Court Order of September

7    1st, and I do that for the reason of the weather.

8    That if it is a wet spring, whether it looks like it

9    will be now or not, the weather will do what the

10   weather does.

11        I've been in many situations where we have

12   to go back to the Court, because June 1st there's snow

13   melt, rain, it's excessively wet, and it would cause

14   more harm to these areas than it would if it was, I

15   think the testimony was, as soon as it's dried out.

16        So what I would ask is that it be

17   September 1st, without the need for coming back for

18   relief from the Court, but that the parties, in good

19   faith, would seek to have it done much sooner than

20   that.

21        Seeing some of these, you just can't get it

22   done in a particular growing season, but the effort

23   would be to get it done.  But I think September 1st

24   would make it possible that we could assure, in all

25   likelihood, it would be done by that time.

1  THE COURT:  Mr. Clapper, did you want to add

2  anything else?

3  MR. CLAPPER:  No, Your Honor.

4  THE COURT:  In light of the fact that it

5  looks like we're having a very late spring, since it

6  just snowed again this weekend, and I think they're

7  predicting more snow this coming weekend, I think

8  June 1st might be a little over-ambitious, especially

9  if you want to make sure the land is dried out so that

10  it doesn't do more harm to the area.

11  So I'm going to set a deadline of

12  August 1st, and just ask to try to have it done as

13  soon as possible.

14  So then on the other sentencing issues,

15  Mr. Leistico, would you like to speak on behalf of

16  your client?

17  MR. LEISTICO:  Thank you, Your Honor.

18  I think the presentence investigation set

19  out Mr. Mast adequately.  He presents himself here.

20  He's never been in trouble with the law of any kind.

21  I think he is the last person that wants to be here

22  for any reason.  He didn't try to be here.

23  He understands what the jury verdict means.

24  He will follow the direction of the Court.

25  He will restore this, unless otherwise

agreed to by the Court or Fish and Wildlife, and I
believe we can come to an amenable agreement without
the need for the Court's intervention at a later time,
and he will do that restoration.

I don't think he meant -- I spent a lot of
time with Mr. Mast. I don't think he meant to violate
an easement or otherwise. He sincerely apologizes for
the time this matter has taken.

He did work with Fish and Wildlife at some
length to work out what he thought was a proper
restoration order. But he's here to follow the
Court's order.

I would ask initially, as set out in our
presentence filings, one, I think that I very
strenuously would ask the Court for no incarceration.
I don't think he'll ever be back in front of this
Court or any other Court, based on the experience he's
shown everyone in his life. He will follow through
and get this matter taken care of. I would ask the
Court -- I think that is something that would be
appropriate.

I would ask the Court to consider the cost
in doing the restitution on the site, for the cost of
that in offsetting the fine amount. I would ask the
Court, if there's going to be a fine, a lower fine to

1     allow for that.

2          He put in tens of thousands of dollars on

3     this tile.  I think he thought it was approved.  He

4     ended up being wrong.  But he's going to have to live

5     with that cost, without any benefit to the property.

6     So I would ask the Court to consider that.

7          And as to any probationary time, if the

8     Court is going to require probationary time, that that

9     be no longer than necessary to assure that the

10    restitution is complete.

11         Other than that, he has followed the NRCS

12    requirement.  He will follow the order of the Court

13    here.  I ask you to take his entire life experience

14    and situation and his background on this matter into

15    consideration on the sentencing.

16         We'd ask for no incarceration, and a

17    reasonable fine, if the Court is so inclined, and I

18    would ask the Court to have any probationary period

19    just be long enough to assure that the restoration is

20    completed.  Thank you.

21         THE COURT:  Thank you.  Mr. Mast, did you

22    want to say anything?

23         THE DEFENDANT:  Your Honor, I just want to

24    apologize for this situation.  I never meant for this

25    to happen.  I thought it was worth defending.  I

respect your decision.

THE COURT:  Thank you.  Ma'am, did you want to say anything?  Okay.

Mr. Clapper?

MR. CLAPPER:  Thank you, Your Honor.

Your Honor, this was a very important matter to the Fish and Wildlife Service.  These easements have been in place for years.  They try to work very reasonably and diligently with landowners.

They try to put them on notice of what their easements are.  They try to work with them when requests are made.  I think the Court could see that from the testimony that was offered at trial.

Here we have six distinct wetland areas on this property that were all affected by the installation of drain tile, that if Mr. Mast had paid more attention to the correspondence that was sent to him, he could have avoided all of this.

But we're here now with this.  The Government is not seeking any jail time.  This is not the offense that that would be warranted.

But we are seeking the Court's order of the implementation of the restoration plan, as submitted by the Government, as well as a fine in this case.

THE COURT:  Thank you.

1      Mr. Mast, especially this time of year, when

2  the ducks and geese and waterfowl are migrating from

3  the south to the north, I think everybody in

4  South Dakota understands how important these wetland

5  areas are.  They are necessary during that migration

6  period, in particular, so that the waterfowl have a

7  place to land on that long migration route that

8  they're taking.

9      It did appear to me during the trial that

10 U.S. Fish and Wildlife was trying to put you on

11 notice, and for some reason, it just did not work out.

12 But that's why it is important for you to restore

13 these lands so that they are restored back to wetland.

14     I don't see any reason to impose a custody

15 sentence.  So there will be no custody sentence.

16     I think one year of probation is sufficient.

17 Assuming you don't have any violations, if you're able

18 to restore the land, you can ask to have the probation

19 period ended early once that restoration plan has been

20 put into place.

21     I'm going to impose a small fine of $100,

22 and then there will be the $10 special assessment fee.

23     Your only condition of probation will be

24 completion of the restoration plan.

25     If you would please stand, I'm going to

1    state the sentence, but I won't impose it until

2    counsel has had an opportunity to state any

3    objections.

4         Under the statutory and constitutional

5    authority vested in this Court, it's the judgment of

6    the Court that the Defendant, Kevin Mast, is hereby

7    placed on probation for a term of one year.

8         While you're on probation, you must not

9    commit another Federal, State, or local crime.  You

10   must not unlawfully possess a controlled substance.

11   Mandatory drug testing is suspended, because I think

12   you're a low risk of future substance abuse.

13        You must comply with the standard conditions

14   that have been adopted by this Court and the following

15   special condition:

16        You must comply with the restoration plan,

17   subject to any changes agreed upon between U.S. Fish

18   and Wildlife and you.  If the parties are not able to

19   agree, the Court will be the final arbiter of any

20   proposed changes.

21        It is further ordered that you shall pay to

22   the United States a fine of $100, which must be paid

23   before the end of your term of probation.

24        I find you do not have the ability to pay

25   interest, so the interest is waived, but you will need

1    to pay to the United States a special assessment of

2    $10, which is due immediately.

3            And if you haven't fully complied with the

4    restoration plan or paid the fine or special

5    assessment, you need to notify the Court of any

6    material change in your economic circumstances that

7    might affect your ability to complete the restoration

8    plan, pay your fine, or special assessment.

9            Counsel, are either of you aware of any

10   reason why the sentence can't be imposed as I stated?

11           MR. CLAPPER:  No, Your Honor.  But did you

12   mention the deadline?

13           THE COURT:  Thank you.  The deadline for

14   complying with the restoration plan is by August 1st

15   of 2018.

16           MR. CLAPPER:  Thank you.  No objection.

17           THE COURT:  Mr. Leistico, any objections?

18           MR. LEISTICO:  I have no objection,

19   Your Honor.

20           THE COURT:  Then the sentence will be

21   imposed as I stated.  You can be seated.

22           Mr. Mast, if you think that a mistake was

23   made and you want to have another Court review what

24   it's done, you would need to file a notice of appeal

25   within 14 days from today with the Clerk of Courts

1    Office.  Do you understand that?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Anything further from either

4    side?

5              MR. CLAPPER:  No, Your Honor.

6              MR. LEISTICO:  Nothing else.  Thank you,

7    Your Honor.

8              THE COURT:  We'll be adjourned.

9              (End of proceedings at 11:00 a.m.)

1    UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA  :SS  CERTIFICATE OF REPORTER
2    SOUTHERN DIVISION

3

        I, Jill M. Connelly, Official United States
4    District Court Reporter, Registered Merit Reporter,
Certified Realtime Reporter, and Notary Public, hereby
5    certify that the above and foregoing transcript is the
true, full, and complete transcript of the
6    above-entitled case, consisting of Pages 1 - 40.

7         I further certify that I am not a relative or
employee or attorney or counsel of any of the parties
8    hereto, nor a relative or employee of such attorney or
counsel, nor do I have any interest in the outcome or
9    events of the action.

10        IN TESTIMONY WHEREOF, I have hereto set my
hand this 28th day of June, 2018.
11

12            /s/ Jill M. Connelly

13           _____

            Jill M. Connelly, RMR, CRR
14           Court Reporter
            United States Courthouse
15           400 S. Phillips Avenue
            Sioux Falls, SD 57104
16           Phone:  (605) 330-6669
            E-mail:  Jill_Connelly@sdd.uscourts.gov
17

18

19

20

21

22

23

24

25

**$**

**$10** [3] - 4:9, 37:22, 39:2
**$10,000** [2] - 4:6, 12:2
**$100** [2] - 37:21, 38:22
**$4,000** [2] - 13:11, 15:6
**$65,000** [1] - 12:14
**$70,000** [1] - 12:15

**/**

**/s** [1] - 41:12

**1**

**1** [24] - 2:14, 6:11, 6:23, 7:23, 7:24, 12:17, 12:24, 13:5, 13:10, 14:8, 14:9, 14:10, 14:18, 16:7, 16:8, 16:17, 18:18, 22:22, 25:1, 25:18, 27:4, 27:8, 31:24, 41:6
**10** [1] - 8:11
**1015** [1] - 1:23
**10:00** [2] - 1:13, 3:3
**11-19-2017** [1] - 2:19
**11:00** [1] - 40:9
**14** [1] - 39:25
**15** [2] - 2:18
**150** [3] - 8:7, 12:2, 12:8
**150-foot** [2] - 12:4, 22:17
**16** [1] - 2:6
**17-40078** [1] - 1:4
**18** [1] - 2:7
**180** [1] - 4:2
**19** [1] - 15:14
**1973** [6] - 18:20, 19:6, 19:10, 21:7, 21:19, 22:15
**1st** [8] - 32:5, 32:7, 32:12, 32:17, 32:23, 33:8, 33:12, 39:14

**2**

**2** [8] - 2:18, 7:8, 15:11, 15:20, 15:23, 15:25, 16:6
**2-9-2018** [1] - 2:16

**2013** [4] - 19:6, 21:7, 21:20, 22:16
**2013's** [1] - 19:8
**2015** [2] - 8:20, 10:3
**2016** [3] - 10:20, 10:21, 10:22
**2017** [4] - 10:25, 11:2, 15:14, 16:1
**2018** [4] - 1:12, 3:1, 39:15, 41:10
**2638** [1] - 1:20
**28th** [1] - 41:10

**3**

**3** [4] - 22:1, 22:3, 22:7, 28:1
**300** [1] - 1:23
**330-6669** [1] - 41:16

**4**

**4** [3] - 10:7, 22:4, 27:14
**40** [1] - 41:6
**400** [1] - 41:15

**5**

**5** [3] - 2:6, 22:4, 27:14
**56301** [1] - 1:24
**57101-2638** [1] - 1:20
**57104** [1] - 41:15

**6**

**6** [4] - 2:14, 22:5, 27:15
**6,000** [1] - 12:11
**605** [1] - 41:16

**7**

**7** [4] - 16:8, 18:18, 22:5, 27:15

**9**

**9** [2] - 1:12, 3:1
**900** [1] - 11:13

**A**

**a.m** [3] - 1:13, 3:3,
40:9
**ability** [2] - 38:24, 39:7
**able** [5] - 24:8, 25:25, 31:11, 37:17, 38:18
**above-entitled** [1] - 41:6
**absolutely** [1] - 11:9
**abuse** [1] - 38:12
**acceptable** [2] - 28:21, 31:13
**access** [2] - 11:18, 12:19
**accomplished** [1] - 8:14
**accurate** [1] - 6:18
**acreage** [1] - 24:14
**acres** [1] - 24:15
**action** [1] - 41:9
**add** [1] - 33:1
**adding** [1] - 19:15
**addition** [1] - 15:6, 26:7
**additional** [5] - 21:12, 24:16, 26:24, 27:1, 28:9
**address** [1] - 3:19
**adequately** [1] - 33:19
**adjacent** [1] - 7:7
**adjourned** [1] - 40:8
**admission** [1] - 15:20
**adopted** [3] - 20:16, 28:18, 38:14
**advisory** [1] - 3:25
**Aerial** [1] - 2:19
**aerial** [2] - 15:13, 15:16
**affect** [1] - 39:7
**affected** [1] - 36:15
**Agency** [4] - 21:22, 22:13, 23:2, 23:4
**ago** [2] - 7:19, 16:3
**agree** [11] - 4:10, 17:6, 17:14, 17:18, 28:25, 29:8, 29:21, 30:5, 30:6, 31:11, 38:19
**agreed** [6] - 28:19, 29:14, 29:17, 31:9, 34:1, 38:17
**agreement** [1] - 34:2
**allow** [7] - 13:15, 19:18, 22:3, 23:21, 24:9, 29:7, 35:1
**allowed** [2] - 23:13, 24:6
**allowing** [1] - 21:16
**almost** [1] - 27:13

**alter** [1] - 18:9
**alternative** [1] - 29:24
**ambitious** [1] - 33:8
**amenable** [1] - 34:2
**amended** [1] - 3:19
**AMERICA** [1] - 1:5
**America** [1] - 3:6
**amount** [3] - 26:20, 27:4, 34:24
**ample** [2] - 21:9, 21:24
**Anderson** [2] - 15:13, 15:14
**Anna** [1] - 15:13
**Anthony** [1] - 5:4
**anyhow** [1] - 24:4
**apologize** [1] - 35:24
**apologizes** [1] - 34:7
**appeal** [1] - 39:24
**appear** [2] - 6:21, 37:9
**appearances** [1] - 3:7
**APPEARANCES** [1] - 1:18
**applies** [1] - 27:24
**apply** [1] - 30:10
**appreciate** [3] - 26:17, 30:7, 31:2
**approach** [1] - 11:8
**appropriate** [1] - 34:21
**approvals** [1] - 30:22
**approve** [2] - 28:15, 30:8
**approved** [3] - 24:20, 25:1, 35:3
**approximation** [1] - 12:15
**April** [1] - 1:12
**APRIL** [1] - 3:1
**arbiter** [2] - 31:12, 38:19
**Area** [7] - 14:8, 14:9, 14:18, 22:1, 22:3, 22:4, 28:1
**area** [14] - 4:8, 8:6, 10:24, 12:25, 15:17, 16:21, 16:24, 17:12, 17:25, 18:10, 18:25, 19:4, 19:18, 33:10
**areas** [28] - 8:21, 9:3, 9:8, 9:20, 9:23, 12:12, 16:8, 16:19, 17:15, 18:3, 18:5, 18:7, 23:8, 23:21, 25:4, 26:6, 26:8, 26:14, 27:3, 27:13, 27:16, 27:23, 30:16, 30:18, 32:14,

36:14, 37:5
**Areas** [1] - 16:8
**argue** [1] - 22:17
**artificial** [2] - 24:5, 26:24
**as-is** [1] - 15:3
**assessment** [5] - 4:9, 37:22, 39:1, 39:5, 39:8
**Assistant** [1] - 1:19
**assume** [1] - 29:22
**assuming** [3] - 18:21, 21:6, 37:17
**assure** [3] - 32:24, 35:9, 35:19
**attached** [2] - 6:14, 6:22
**attempt** [1] - 32:5
**attention** [1] - 36:17
**Attorney** [1] - 1:19
**attorney** [2] - 41:7, 41:8
**August** [2] - 33:12, 39:14
**author** [1] - 14:7
**authority** [1] - 38:5
**Avenue** [1] - 41:15
**avoided** [1] - 36:18
**aware** [3] - 17:2, 21:2, 39:9
**AZURE** [2] - 2:6, 4:23
**Azure** [8] - 4:20, 5:4, 6:25, 16:17, 21:4, 22:23, 23:14, 24:3

**B**

**backfilling** [1] - 8:8
**background** [1] - 35:14
**backs** [1] - 22:8
**Bank** [1] - 1:23
**based** [7] - 6:6, 7:14, 24:21, 25:21, 26:19, 34:17
**basin** [7] - 17:6, 17:9, 17:10, 17:11, 17:23, 27:14, 27:23
**basins** [3] - 17:5, 23:11, 28:12
**basis** [2] - 21:8, 30:5
**BEFORE** [1] - 1:16
**beginning** [1] - 8:5
**behalf** [3] - 3:9, 3:12, 33:15
**belief** [1] - 18:1
**believes** [1] - 23:23
**below** [2] - 14:18,

22:18
**beneath** [6] - 8:20, 8:21, 8:22, 9:7, 9:10, 12:11
**benefit** [1] - 35:5
**benefits** [1] - 11:7
**best** [1] - 32:2
**better** [1] - 20:2
**between** [3] - 28:20, 31:10, 38:17
**biggest** [1] - 27:25
**bit** [3] - 6:3, 18:12
**block** [8] - 8:12, 14:19, 19:25
**blockage** [1] - 9:25
**blocked** [3] - 17:10, 27:5, 28:2
**blocking** [1] - 23:12
**blocks** [1] - 18:22
**blow** [1] - 20:1
**blowouts** [1] - 19:22
**blue** [7] - 10:11, 14:10, 14:15, 15:3, 19:16, 19:18, 21:10
**Board** [2] - 5:21, 22:18
**bottleneck** [1] - 23:1
**bottom** [1] - 23:12
**Box** [1] - 1:20
**break** [1] - 22:17
**breaks** [1] - 8:11
**budget** [5] - 19:4, 21:6, 22:14, 23:3, 26:21
**BWSR** [1] - 22:19
**BY** [4] - 5:2, 6:24, 15:24, 16:16

## C

**calculated** [1] - 8:23
**capacity** [1] - 19:2
**capped** [2] - 8:13, 10:15
**capping** [1] - 8:10
**care** [2] - 13:22, 34:19
**case** [16] - 5:11, 5:14, 7:19, 8:18, 8:25, 9:1, 9:6, 9:8, 11:13, 11:25, 12:13, 28:24, 28:25, 29:10, 36:24, 41:6
**cases** [2] - 6:5, 28:7
**causes** [2] - 18:19, 24:10
**Center** [1] - 6:2
**certainly** [1] - 21:18
**CERTIFICATE** [1] -

41:1
**certified** [1] - 30:15
**Certified** [1] - 41:4
**certify** [2] - 41:5, 41:7
**chance** [2] - 3:14, 15:8
**change** [3] - 4:7, 22:24, 39:6
**changes** [6] - 21:23, 28:15, 28:19, 31:9, 38:17, 38:20
**circumstances** [1] - 39:6
**civil** [1] - 21:13
**CLAPPER** [29] - 3:9, 3:23, 4:11, 4:18, 5:2, 6:10, 6:16, 6:24, 15:19, 15:24, 16:11, 20:5, 20:11, 20:18, 24:24, 26:3, 28:16, 28:22, 29:12, 29:17, 30:2, 31:14, 31:18, 31:24, 33:3, 36:5, 39:11, 39:16, 40:5
**Clapper** [12] - 1:19, 3:9, 6:17, 20:4, 20:15, 23:14, 24:23, 28:13, 29:7, 31:17, 33:1, 36:4
**Clapper's** [1] - 26:17
**clear** [1] - 29:6
**Clerk** [1] - 39:25
**client** [3] - 3:15, 26:14, 33:16
**Cloud** [1] - 1:24
**coming** [5] - 5:16, 28:1, 29:2, 32:17, 33:7
**comments** [2] - 24:21, 26:17
**commit** [1] - 38:9
**compacting** [1] - 8:9
**comparable** [1] - 19:9
**complete** [5] - 26:21, 32:2, 35:10, 39:7, 41:5
**completed** [2] - 13:13, 35:20
**completely** [5] - 11:19, 12:8, 12:9, 27:13
**completing** [1] - 31:20
**completion** [1] - 37:24
**complied** [1] - 39:3
**comply** [5] - 29:21, 31:4, 31:8, 38:13,

38:16
**complying** [1] - 39:14
**compound** [1] - 11:19
**concern** [9] - 7:6, 14:6, 16:25, 17:18, 19:21, 20:25, 21:5, 23:24, 27:25
**concerns** [4] - 7:2, 7:4, 14:4, 26:11
**concluded** [1] - 6:8
**conclusive** [1] - 22:6
**condition** [3] - 25:5, 37:23, 38:15
**conditions** [5] - 13:14, 16:5, 21:7, 26:20, 38:13
**Connelly** [3] - 41:3, 41:12, 41:13
**consequences** [1] - 25:15
**consider** [3] - 29:24, 34:22, 35:6
**consideration** [5] - 19:4, 21:23, 22:14, 24:7, 35:15
**considered** [1] - 11:5
**consisting** [1] - 41:6
**constitutional** [1] - 38:4
**consultants** [1] - 7:1
**consultation** [1] - 7:15
**consulted** [1] - 5:19
**contemplate** [1] - 28:24
**contemplated** [1] - 30:13
**contemplates** [1] - 29:2
**contemplating** [1] - 25:17
**continue** [1] - 23:21
**contractor** [2] - 11:12, 12:3
**contributing** [1] - 18:4
**controlled** [1] - 38:10
**corner** [2] - 14:9, 21:25
**correct** [20] - 3:20, 3:23, 5:12, 6:9, 7:25, 9:21, 10:10, 10:13, 10:16, 13:8, 13:21, 14:3, 14:23, 15:4, 16:16, 16:22, 17:11, 17:17, 26:1
**correspondence** [1]

- 36:17
**cost** [16] - 11:8, 11:24, 12:1, 12:5, 13:1, 13:2, 13:9, 15:5, 23:13, 24:2, 25:8, 26:25, 27:2, 34:22, 34:23, 35:5
**cost-effective** [4] - 13:1, 13:2, 24:2, 25:8
**counsel** [7] - 3:2, 3:7, 4:10, 38:2, 39:9, 41:7, 41:8
**counterproposal** [1] - 25:3
**County** [2] - 9:9, 10:8, 12:13
**county** [1] - 30:10
**couple** [2] - 8:14, 10:22
**course** [3] - 7:17, 13:5, 30:19
**COURT** [49] - 1:1, 3:4, 3:13, 3:17, 3:21, 3:24, 4:13, 4:21, 6:12, 6:21, 15:21, 15:23, 16:13, 18:17, 18:23, 19:8, 19:12, 19:15, 20:3, 20:6, 20:8, 20:10, 20:12, 20:14, 20:19, 24:23, 25:23, 26:13, 28:13, 28:18, 29:5, 29:16, 29:20, 30:21, 31:7, 31:16, 31:22, 31:25, 33:1, 33:4, 35:21, 36:2, 36:25, 39:13, 39:17, 39:20, 40:3, 40:8, 41:1
**Court** [47] - 1:16, 2:7, 3:2, 6:7, 10:18, 20:22, 20:24, 21:2, 23:20, 24:1, 24:19, 25:1, 25:17, 27:5, 28:5, 28:18, 29:10, 29:13, 29:19, 29:24, 31:11, 32:2, 32:6, 32:12, 32:18, 33:24, 34:1, 34:15, 34:17, 34:20, 34:22, 34:25, 35:6, 35:8, 35:12, 35:17, 35:18, 36:12, 38:5, 38:6, 38:14, 38:19, 39:5, 39:23, 41:4, 41:14
**Court's** [5] - 21:4, 31:3, 34:3, 34:12, 36:22
**Courthouse** [2] - 1:11, 41:14
**Courts** [1] - 39:25

**Cr** [1] - 1:4
**crime** [1] - 38:9
**CROSS** [1] - 16:15
**Cross** [1] - 2:3
**CROSS-EXAMINATION** [1] - 16:15
**CRR** [1] - 41:13
**custody** [3] - 4:2, 37:14, 37:15

## D

**Dakota** [5] - 6:2, 10:4, 10:5, 21:13, 37:4
**DAKOTA** [2] - 1:2, 41:1
**damage** [3] - 9:3, 9:12, 13:15
**Dave** [1] - 4:20
**DAVID** [2] - 2:6, 4:23
**David** [1] - 5:4
**days** [2] - 4:2, 39:25
**deadline** [5] - 31:20, 31:22, 33:11, 39:12, 39:13
**deal** [2] - 25:4, 29:3
**dealing** [1] - 25:15
**decided** [2] - 7:22, 29:19
**decision** [1] - 36:1
**Defendant** [7] - 1:9, 1:24, 1:25, 3:2, 4:4, 25:9, 38:6
**DEFENDANT** [2] - 35:23, 40:2
**Defendant's** [1] - 4:13
**defending** [1] - 35:25
**defense** [1] - 25:2
**deliver** [2] - 12:20, 18:11
**delivery** [1] - 18:6
**depicted** [3] - 7:23, 16:5, 22:1
**describe** [1] - 8:2
**described** [2] - 7:23, 10:1
**designated** [1] - 26:6
**designed** [1] - 26:5
**detailed** [1] - 26:18
**details** [2] - 13:18, 25:19
**determination** [1] - 30:15
**determined** [1] - 16:21
**determiner** [1] -

29:11
**develop** [2] - 11:17, 12:22
**diagram** [1] - 10:8
**difference** [1] - 13:19
**different** [8] - 7:5, 8:14, 8:15, 10:22, 17:12, 18:1, 18:12, 22:15
**difficult** [1] - 11:24
**dig** [1] - 9:14
**diligently** [1] - 36:9
**DIRECT** [1] - 5:1
**Direct** [1] - 2:3
**direction** [1] - 33:24
**disagree** [1] - 29:1
**discussions** [1] - 23:4
**disputes** [1] - 29:3
**distance** [1] - 8:23
**distinct** [1] - 36:14
**DISTRICT** [4] - 1:1, 1:2, 41:1, 41:1
**District** [3] - 1:16, 5:19, 41:4
**disturb** [1] - 26:5
**disturbing** [3] - 25:9, 25:10
**DIVISION** [2] - 1:3, 41:2
**document** [1] - 6:22
**dollars** [1] - 35:2
**done** [12] - 6:3, 9:12, 14:1, 22:10, 28:11, 32:5, 32:19, 32:22, 32:23, 32:25, 33:12, 39:24
**dot** [1] - 27:9
**dots** [1] - 27:10
**down** [3] - 11:24, 12:22, 19:25
**downgrade** [1] - 17:19
**downstream** [8] - 8:5, 9:20, 12:25, 16:21, 16:23, 17:23, 23:11, 27:19
**draft** [2] - 6:18, 6:25
**drafted** [3] - 5:14, 5:22, 7:3
**drain** [8] - 6:3, 9:4, 22:4, 22:5, 22:7, 25:6, 25:13, 36:16
**drawn** [1] - 18:17
**dried** [2] - 32:15, 33:9
**drug** [1] - 38:11
**dry** [4] - 10:25, 13:14, 13:16
**ducks** [1] - 37:2

**due** [2] - 18:19, 39:2
**duly** [1] - 4:24
**during** [2] - 37:5, 37:9

## E

**E-mail** [1] - 41:16
**early** [1] - 37:19
**easement** [8] - 6:5, 7:9, 8:19, 24:18, 27:18, 27:24, 28:17, 34:7
**easements** [2] - 36:7, 36:11
**ecologist** [1] - 5:25
**economic** [1] - 39:6
**economical** [1] - 12:2
**effect** [2] - 7:10, 8:24
**effective** [6] - 9:22, 13:1, 13:2, 24:2, 25:8, 25:21
**effort** [1] - 32:22
**either** [3] - 29:18, 39:9, 40:3
**elevations** [1] - 27:6
**employee** [2] - 41:7, 41:8
**end** [5] - 7:12, 18:3, 21:5, 27:8, 38:23
**End** [1] - 40:9
**ended** [2] - 35:4, 37:19
**ends** [2] - 8:10, 8:12
**engineer** [1] - 5:22
**entails** [2] - 8:3, 8:4
**enter** [1] - 17:21
**entering** [2] - 21:14, 24:10
**enters** [1] - 22:2
**entire** [1] - 35:13
**entitled** [2] - 3:5, 41:6
**entity** [1] - 28:14
**equipment** [2] - 11:12, 13:15
**especially** [3] - 9:4, 33:8, 37:1
**essentially** [1] - 17:5
**estimate** [3] - 12:10, 13:11, 15:6
**estimated** [2] - 12:1, 12:5
**estimates** [1] - 12:13
**estimation** [1] - 9:11
**events** [1] - 41:9
**evidence** [3] - 21:10, 21:24, 22:6

**exactly** [1] - 21:7
**EXAMINATION** [2] - 5:1, 16:15
**example** [4] - 7:2, 7:6, 11:25, 22:21
**excavate** [4] - 9:11, 9:17, 12:3, 13:16
**excavated** [1] - 13:20
**excavating** [1] - 9:3
**excavation** [1] - 14:2
**excavator** [1] - 11:11
**excessive** [2] - 13:15, 27:1
**excessively** [1] - 32:13
**excused** [2] - 20:8, 20:9
**Exhibit** [21] - 2:14, 2:18, 6:11, 6:23, 7:23, 7:24, 12:17, 12:24, 13:5, 13:10, 14:10, 15:11, 15:20, 15:25, 16:6, 16:7, 16:17, 17:18, 22:22, 25:1, 25:18
**exhibit** [1] - 17:1
**EXHIBITS** [1] - 2:9
**exist** [1] - 16:5
**existing** [2] - 18:19, 24:11
**exit** [1] - 19:19
**expandable** [3] - 11:17, 12:6, 12:16
**expect** [1] - 31:3
**expediting** [1] - 18:6
**expense** [2] - 11:15, 13:7
**experience** [3] - 11:23, 34:17, 35:13
**expressed** [3] - 7:4, 14:6, 19:21
**extensive** [3] - 9:5, 9:9, 27:15
**extensiveness** [1] - 19:23
**extent** [1] - 29:2
**extra** [1] - 25:15
**extrapolate** [1] - 12:13
**eyeballed** [1] - 12:10

## F

**fact** [4] - 10:6, 19:16, 27:9, 33:4
**fair** [4] - 20:17, 20:18, 26:20
**fairly** [1] - 22:6
**faith** [2] - 32:4, 32:19

**fall** [1] - 10:22
**Falls** [4] - 1:12, 1:17, 1:20, 41:15
**far** [1] - 12:18
**fashion** [2] - 8:13, 18:12
**federal** [1] - 31:6
**Federal** [2] - 1:11, 38:9
**fee** [1] - 37:22
**feedback** [1] - 6:20
**feet** [5] - 8:7, 11:13, 12:2, 12:8, 12:11
**few** [1] - 10:3
**file** [1] - 39:24
**filings** [1] - 34:14
**fill** [3] - 8:8, 12:8, 12:9
**final** [3] - 29:10, 31:12, 38:19
**fine** [10] - 4:6, 34:24, 34:25, 35:17, 36:24, 37:21, 38:22, 39:4, 39:8
**Finnochiaro** [7] - 5:24, 6:3, 7:1, 7:6, 7:17, 9:2, 19:20
**first** [5] - 4:16, 4:24, 7:19, 20:15, 20:20
**Fish** [22] - 2:15, 5:6, 5:13, 9:18, 11:4, 14:20, 15:15, 16:6, 21:1, 26:9, 28:7, 28:13, 28:20, 29:25, 30:24, 31:4, 31:10, 34:1, 34:9, 36:7, 37:10, 38:17
**five** [1] - 4:5
**foam** [1] - 11:17, 11:19, 12:6, 12:16, 12:21, 12:23
**foaming** [1] - 12:1
**follow** [5] - 20:24, 33:24, 34:11, 34:18, 35:12
**followed** [2] - 26:1, 35:11
**following** [1] - 38:14
**follows** [2] - 4:25, 27:22
**foregoing** [1] - 41:5
**form** [2] - 4:7, 13:16
**formerly** [1] - 5:25
**forming** [1] - 22:14
**front** [1] - 34:16
**full** [1] - 41:5
**fully** [1] - 39:3
**fundamentally** [1] - 22:9
**future** [1] - 38:12

## G

**Gary** [2] - 1:22, 3:12
**gather** [1] - 5:16
**gathering** [1] - 6:6
**geese** [1] - 37:2
**gentleman** [1] - 5:23
**gentlemen** [2] - 6:19, 7:4
**Geological** [1] - 6:1
**Germain** [1] - 1:23
**goal** [1] - 18:24
**government** [1] - 31:5
**Government** [17] - 3:21, 6:11, 12:24, 13:5, 13:10, 15:11, 15:20, 15:25, 16:6, 16:7, 16:17, 24:25, 25:7, 27:21, 28:4, 36:20, 36:24
**GOVERNMENT'S** [1] - 2:12
**ground** [3] - 7:11, 10:14, 26:21
**growing** [1] - 32:22
**Guide** [2] - 5:20, 14:7
**guideline** [1] - 3:25

## H

**Hamlin** [6] - 9:8, 10:8, 12:13, 17:2, 22:21, 27:12
**hand** [1] - 41:10
**harm** [3] - 28:9, 32:14, 33:10
**harmless** [2] - 28:2, 28:4
**hear** [1] - 20:14
**HEARING** [1] - 1:14
**held** [3] - 17:22, 28:2, 28:3
**hereby** [2] - 38:6, 41:4
**hereto** [2] - 41:8, 41:10
**himself** [1] - 33:19
**hire** [2] - 11:12, 12:3
**hits** [1] - 19:25
**Honor** [36] - 3:11, 3:16, 3:23, 4:11, 4:12, 4:18, 6:10, 6:15, 15:19, 15:22, 16:14, 18:16, 20:5, 20:7, 20:11, 20:13, 20:18, 20:20, 24:22, 24:24, 25:19, 26:16, 28:16,

28:23, 31:14, 31:18, 32:1, 33:3, 33:17, 35:23, 36:5, 36:6, 39:11, 39:19, 40:5, 40:7

**Honorable** [1] - 1:16
**hopeful** [1] - 16:10
**hundred** [1] - 24:15
**hydraulic** [1] - 19:22
**hydrology** [1] - 28:12

## I

**idea** [4] - 12:5, 13:9, 21:10, 23:10
**identified** [2] - 26:14, 27:3
**immediately** [1] - 39:2
**impact** [3] - 4:14, 6:14, 6:22
**implementation** [1] - 36:23
**important** [3] - 36:6, 37:4, 37:12
**impose** [3] - 37:14, 37:21, 38:1
**imposed** [4] - 4:1, 4:3, 39:10, 39:21
**IN** [1] - 41:10
**inaccurate** [1] - 18:2
**incarceration** [2] - 34:15, 35:16
**inclined** [1] - 35:17
**include** [1] - 17:15
**included** [1] - 14:16
**incur** [1] - 13:6
**independent** [1] - 30:14
**independently** [1] - 31:6
**INDEX** [2] - 2:1, 2:9
**indicate** [3] - 10:7, 30:24, 31:8
**indicated** [2] - 21:5, 24:3
**indicates** [1] - 10:11
**information** [1] - 6:6
**inject** [2] - 11:18, 12:23
**inoperable** [2] - 8:5, 8:6
**input** [2] - 5:16, 6:20
**inserted** [1] - 10:9
**installation** [1] - 36:16
**installed** [2] - 19:1, 25:5
**installing** [1] - 25:13

**instance** [2] - 3:24, 19:7
**instances** [1] - 18:5
**intercept** [1] - 7:11
**interest** [3] - 38:25, 41:8
**intervention** [1] - 34:3
**intrusive** [1] - 12:16, 12:18, 12:25
**investigating** [2] - 7:20, 11:16
**investigation** [1] - 33:18
**involved** [1] - 9:7
**issue** [2] - 4:19, 31:18
**issues** [1] - 33:14

## J

**jail** [1] - 36:20
**JAY** [1] - 1:8
**Jay** [1] - 3:6
**Jeff** [1] - 3:9
**Jeffrey** [1] - 1:19
**Jill** [3] - 41:3, 41:12, 41:13
**Jill_Connelly@sdd.uscourts.gov** [1] - 41:16
**Judge** [1] - 1:16
**judgment** [1] - 38:5
**June** [1] - 31:24, 32:5, 32:12, 33:8, 41:10
**jury** [1] - 33:23

## K

**Karen** [1] - 1:16
**Kevin** [3] - 1:25, 3:6, 38:6
**KEVIN** [1] - 1:8
**kind** [2] - 17:25, 33:20
**knowledge** [1] - 7:14

## L

**lack** [1] - 20:2
**Lake** [1] - 5:10
**land** [7] - 8:22, 15:17, 19:24, 24:16, 33:9, 37:7, 37:18
**landowner** [6] - 11:7, 13:3, 13:4, 13:6, 19:17, 21:16

**landowners** [1] - 36:9
**lands** [1] - 37:13
**large** [2] - 9:10, 27:4
**last** [4] - 7:23, 8:1, 10:7, 33:21
**late** [1] - 33:5
**lateral** [2] - 7:10, 8:23
**law** [3] - 21:13, 33:20
**learned** [1] - 9:1
**least** [5] - 24:6, 25:9, 25:10, 27:20, 30:9
**leaves** [1] - 17:11
**Leistico** [13] - 1:22, 3:12, 3:13, 16:13, 20:6, 20:12, 20:15, 20:19, 26:13, 29:5, 31:25, 33:15, 39:17
**LEISTICO** [21] - 3:11, 3:16, 3:20, 4:12, 6:13, 15:22, 16:14, 16:16, 18:15, 20:7, 20:13, 20:20, 26:16, 29:6, 30:4, 31:2, 31:15, 32:1, 33:17, 39:18, 40:6
**length** [1] - 34:10
**less** [4] - 11:11, 12:16, 12:18, 25:10
**life** [2] - 34:18, 35:13
**light** [2] - 7:20, 33:4
**likelihood** [1] - 32:25
**limited** [1] - 23:20
**line** [12] - 12:19, 12:22, 14:10, 14:15, 15:3, 15:5, 19:25, 21:11, 25:24, 26:4, 26:7, 26:15
**linear** [1] - 12:11
**lines** [9] - 8:5, 9:7, 9:15, 10:9, 10:12, 11:20, 12:1, 12:7, 26:8
**live** [1] - 35:4
**local** [1] - 38:9
**located** [1] - 9:15
**look** [1] - 6:19
**looked** [2] - 3:18, 11:21
**looking** [1] - 18:21
**looks** [2] - 32:8, 33:5
**low** [1] - 38:12
**lower** [1] - 34:25

## M

**ma'am** [1] - 36:2
**Madison** [2] - 5:18,

7:15
**mail** [1] - 41:16
**Management** [1] - 5:19
**manager** [1] - 5:9
**mandatory** [1] - 38:11
**manmade** [2] - 24:10
**map** [2] - 18:17, 28:15
**marked** [1] - 25:24
**Mast** [30] - 1:25, 3:6, 3:12, 11:21, 12:5, 14:22, 17:8, 17:14, 20:23, 21:20, 22:2, 22:9, 23:7, 23:23, 24:6, 25:23, 28:20, 29:9, 29:22, 30:1, 30:23, 31:8, 31:10, 33:19, 34:6, 35:21, 36:16, 37:1, 38:6, 39:22
**MAST** [1] - 1:8
**material** [3] - 8:8, 13:17, 39:6
**matter** [9] - 3:5, 22:21, 23:13, 23:25, 27:17, 34:8, 34:19, 35:14, 36:6
**maximum** [2] - 4:1, 4:6
**mean** [3] - 8:7, 17:24, 23:9
**means** [1] - 33:23
**meant** [3] - 34:5, 34:6, 35:24
**mechanism** [1] - 24:9
**melt** [1] - 32:13
**memorandum** [1] - 4:14
**mention** [1] - 39:12
**Merit** [1] - 41:4
**method** [1] - 25:22
**might** [4] - 7:10, 26:15, 33:8, 39:7
**migrating** [1] - 37:2
**migration** [2] - 37:5, 37:7
**mind** [1] - 31:23
**minimum** [1] - 23:2
**Minnesota** [6] - 5:20, 5:21, 9:25, 14:7, 22:19
**minor** [1] - 7:4
**miss** [1] - 15:14
**mistake** [1] - 39:22
**MN** [1] - 1:24
**months** [1] - 16:3
**morning** [2] - 3:11,

16:17
**most** [3] - 11:1, 18:1, 18:5
**motion** [2] - 29:23, 30:1
**move** [3] - 15:19, 23:10, 24:17
**MR** [50] - 3:9, 3:11, 3:16, 3:20, 3:23, 4:11, 4:12, 4:18, 5:2, 6:10, 6:13, 6:16, 6:24, 15:19, 15:22, 15:24, 16:11, 16:14, 16:16, 18:15, 20:5, 20:7, 20:11, 20:13, 20:18, 20:20, 24:24, 26:3, 26:16, 28:16, 28:22, 29:6, 29:12, 29:17, 30:2, 30:4, 31:2, 31:14, 31:15, 31:18, 31:24, 32:1, 33:3, 33:17, 36:5, 39:11, 39:16, 39:18, 40:5, 40:6
**must** [8] - 38:8, 38:10, 38:13, 38:16, 38:22
**mutually** [2] - 28:19, 30:5

## N

**name** [2] - 5:3, 5:23
**National** [1] - 5:10
**natural** [4] - 18:19, 21:13, 22:5, 24:11
**naturally** [1] - 24:11
**near** [1] - 8:5
**necessary** [3] - 14:24, 35:9, 37:5
**need** [8] - 12:18, 24:5, 25:19, 32:17, 34:3, 38:25, 39:5, 39:24
**needed** [3] - 14:1, 30:17, 30:22
**neighborhood** [2] - 12:11, 12:14
**neighbors** [2] - 25:16, 28:3
**never** [4] - 22:2, 22:10, 33:20, 35:24
**next** [1] - 10:17
**none** [1] - 20:7
**nonperforated** [5] - 14:17, 15:9, 15:16, 21:11, 30:9
**Noonan** [1] - 1:22
**normal** [1] - 30:19

**North** [1] - 6:2
**north** [2] - 7:9, 37:3
**northeast** [1] - 22:7
**Northern** [1] - 6:1
**northwest** [3] - 14:9, 21:11, 22:12
**Notary** [1] - 41:4
**note** [1] - 3:7
**nothing** [1] - 40:6
**notice** [4] - 10:23, 36:10, 37:11, 39:24
**noticed** [1] - 13:19
**notify** [1] - 39:5
**November** [3] - 11:2, 15:14, 16:1
**nowhere** [1] - 20:1
**NRCS** [5] - 30:8, 30:12, 30:17, 30:25, 35:11
**number** [2] - 3:17, 28:10

## O

**objection** [10] - 6:12, 6:15, 15:21, 15:22, 25:25, 26:9, 27:22, 30:3, 39:16, 39:18
**objections** [5] - 3:18, 3:22, 25:2, 38:3, 39:17
**obligation** [1] - 30:14
**observe** [1] - 15:8
**obviously** [1] - 6:4
**occlude** [1] - 11:19
**occurred** [1] - 10:19
**OF** [4] - 1:2, 1:5, 41:1
**offense** [1] - 36:21
**offer** [2] - 4:19, 6:10
**OFFERED** [1] - 2:10
**offered** [2] - 25:3, 36:13
**Office** [1] - 40:1
**office** [1] - 6:8
**Official** [1] - 41:3
**offset** [1] - 27:2
**offsetting** [1] - 34:24
**once** [1] - 37:19
**one** [15] - 4:3, 8:13, 9:7, 9:14, 11:7, 11:18, 12:18, 13:18, 25:8, 25:21, 34:14, 37:16, 38:7
**open** [1] - 3:2
**opportunity** [2] - 24:7, 38:2
**opposed** [1] - 11:14
**option** [7] - 8:15, 8:17, 11:21, 14:16,

14:21, 19:15, 27:20
**Order** [4] - 23:20, 28:5, 31:3, 32:6
**order** [11] - 6:14, 20:24, 20:25, 23:17, 24:20, 31:17, 32:3, 34:11, 34:12, 35:12, 36:22
**ordered** [1] - 38:21
**ordering** [1] - 31:3
**orders** [4] - 20:22, 24:1, 24:19, 32:2
**ordinance** [1] - 30:10
**organic** [1] - 23:18
**otherwise** [4] - 17:21, 18:8, 33:25, 34:7
**outcome** [2] - 29:7, 41:8
**outlet** [1] - 21:16
**outside** [6] - 7:1, 17:15, 22:23, 23:8, 27:15, 29:14
**over-ambitious** [1] - 33:8
**owner** [1] - 8:22

## P

**packed** [1] - 13:17
**Page** [2] - 10:7, 18:18
**page** [4] - 7:24, 8:2, 10:7, 10:17
**Pages** [1] - 41:6
**pages** [1] - 10:6
**paid** [2] - 36:16, 38:22, 39:4
**part** [4] - 9:24, 22:22, 24:18, 27:7
**particular** [8] - 10:21, 11:3, 11:13, 11:25, 19:21, 21:3, 32:22, 37:6
**parties** [7] - 29:1, 29:8, 29:15, 31:11, 32:18, 38:18, 41:7
**past** [1] - 6:5
**pay** [4] - 38:21, 38:24, 39:1, 39:8
**people** [1] - 6:7
**per** [1] - 12:19
**perforated** [1] - 24:9
**period** [5] - 4:2, 4:4, 35:18, 37:6, 37:19
**person** [1] - 33:21
**perspective** [2] - 7:5, 11:4
**Phillips** [1] - 41:15

**Phone** [1] - 41:16
**photo** [2] - 14:10, 15:13
**photograph** [3] - 2:19, 8:3, 15:16
**pilot** [1] - 15:14
**place** [4] - 9:14, 36:8, 37:7, 37:20
**placed** [12] - 4:4, 8:16, 8:20, 17:5, 17:9, 17:13, 18:4, 21:20, 23:10, 23:17, 31:20, 38:7
**places** [1] - 25:21
**Plaintiff** [2] - 1:6, 1:21
**PLAINTIFF'S** [1] - 2:4
**plan** [49] - 4:15, 5:14, 5:17, 6:7, 6:18, 6:19, 6:25, 7:2, 7:5, 7:22, 8:3, 8:4, 9:18, 12:17, 12:24, 13:6, 13:10, 13:11, 13:12, 13:18, 14:15, 14:17, 16:6, 16:18, 18:22, 18:25, 20:16, 20:23, 21:3, 23:4, 23:6, 24:25, 25:7, 25:18, 25:20, 26:4, 26:18, 28:19, 29:13, 29:21, 31:9, 31:20, 36:23, 37:19, 38:20, 39:16, 39:4, 39:8, 39:14
**Plan** [1] - 2:16
**Plaza** [1] - 1:23
**plug** [1] - 12:6
**PO** [1] - 1:20
**point** [4] - 12:19, 19:9, 21:5, 29:22
**pond** [1] - 19:3
**ponding** [4] - 10:23, 11:3, 26:24, 27:1
**pool** [2] - 23:20, 23:21
**portions** [1] - 9:20
**position** [3] - 5:8, 16:7, 29:11
**possess** [1] - 38:10
**possible** [2] - 32:24, 33:13
**possibly** [1] - 30:10
**potential** [2] - 9:2, 20:1
**practice** [1] - 28:22
**Prairie** [1] - 6:1
**pre-1973** [1] - 19:14
**pre-2013** [1] - 19:13
**precipitation** [1] - 11:1

**predicting** [1] - 33:7
**prefer** [1] - 30:4
**prepared** [2] - 6:18, 20:24
**prescribes** [1] - 9:25
**PRESENT** [1] - 1:25
**present** [1] - 3:2
**presented** [1] - 20:21
**presentence** [2] - 33:18, 34:14
**Presentence** [1] - 3:14
**presents** [1] - 33:19
**pressure** [1] - 19:22
**previous** [2] - 12:12, 25:13
**probation** [7] - 4:4, 37:16, 37:18, 37:23, 38:7, 38:8, 38:23
**probationary** [3] - 35:7, 35:8, 35:18
**problem** [2] - 27:21, 29:4
**proceedings** [1] - 40:9
**process** [1] - 30:20
**produced** [1] - 5:21
**profile** [1] - 23:15
**proper** [1] - 34:10
**property** [20] - 10:8, 11:22, 12:6, 14:5, 14:25, 15:8, 17:2, 17:8, 17:15, 19:19, 21:14, 21:17, 21:25, 23:11, 24:16, 27:7, 27:12, 35:5, 36:15
**proposal** [5] - 13:5, 13:22, 14:4, 16:19, 26:10
**proposed** [14] - 9:18, 12:17, 13:10, 13:13, 16:6, 23:5, 24:25, 25:18, 25:20, 26:4, 26:7, 29:13, 31:21, 38:20
**proposing** [1] - 14:21
**protect** [1] - 4:8
**protected** [5] - 7:12, 8:6, 8:21, 9:7, 12:12
**protocol** [2] - 26:1, 27:22
**proximity** [1] - 7:8
**Public** [1] - 41:4
**publication** [3] - 5:19, 5:23, 9:24
**put** [7] - 19:17, 21:19, 24:8, 35:2, 36:10, 37:10, 37:20

## Q

**questionable** [1] - 21:15
**questioning** [2] - 17:1, 23:14
**questions** [4] - 16:12, 18:16, 20:3, 21:4
**quicker** [1] - 18:12
**quite** [3] - 6:3, 25:9, 27:7
**quo** [2] - 19:9, 25:12

## R

**rain** [1] - 32:13
**range** [2] - 3:25, 4:6
**Ray** [2] - 5:23, 5:25
**re** [1] - 26:12
**re-route** [1] - 26:12
**really** [1] - 19:3
**Realtime** [1] - 41:4
**reason** [6] - 22:9, 32:7, 33:22, 37:11, 37:14, 39:10
**reasonable** [3] - 25:8, 25:20, 35:17
**reasonably** [1] - 36:9
**receive** [1] - 11:1
**received** [2] - 6:23, 15:23
**RECEIVED** [1] - 2:10
**recognized** [2] - 28:8, 28:10
**recollection** [1] - 24:15
**recommend** [1] - 8:10
**recommendation** [1] - 8:18
**recommending** [1] - 8:25
**record** [1] - 3:8
**Recross** [1] - 2:3
**recurring** [2] - 18:19, 24:12
**red** [3] - 16:19, 25:24, 26:8
**Redirect** [1] - 2:3
**reduced** [1] - 11:8
**references** [1] - 8:2
**referring** [1] - 14:13
**refuge** [1] - 5:9
**Refuge** [1] - 5:10
**regard** [3] - 4:16, 4:18, 11:15
**regarding** [1] - 31:19

**regardless** [2] - 20:22, 23:6
**Registered** [1] - 41:4
**relative** [2] - 41:7, 41:8
**relatively** [2] - 9:10, 10:25
**release** [1] - 4:3
**relief** [3] - 23:22, 24:17, 32:18
**relying** [1] - 9:24
**remain** [1] - 7:7
**remained** [2] - 7:11, 10:14
**remedy** [1] - 30:6
**remember** [1] - 10:25
**removal** [3] - 8:7, 10:1, 18:9
**remove** [9] - 8:15, 8:22, 9:13, 9:17, 9:19, 11:14, 12:4, 25:23, 26:15
**removed** [5] - 10:12, 11:13, 17:23, 23:15, 23:16
**removing** [5] - 23:7, 23:22, 25:11, 26:11, 28:11
**rendered** [1] - 5:13
**rendering** [2] - 8:4, 8:6
**replacing** [1] - 26:1
**Report** [1] - 3:14
**report** [2] - 3:18, 6:14
**REPORTER** [1] - 41:1
**Reporter** [4] - 41:4, 41:4, 41:14
**represent** [1] - 14:15
**request** [1] - 31:19
**requested** [2] - 4:7, 4:17
**requests** [1] - 36:12
**require** [2] - 8:12, 35:8
**requirement** [2] - 31:6, 35:12
**Research** [1] - 6:2
**research** [1] - 6:3
**residual** [1] - 7:10
**Resources** [2] - 5:22, 22:19
**respect** [1] - 19:2, 36:1
**respects** [1] - 24:18
**rest** [1] - 10:21
**restitution** [5] - 4:7, 4:16, 31:16, 34:23, 35:10

**Restoration** [3] - 2:15, 5:20, 14:7
**restoration** [49] - 4:15, 5:14, 5:17, 6:7, 6:13, 7:21, 7:22, 8:3, 8:4, 8:18, 10:1, 10:19, 10:20, 11:5, 11:8, 12:17, 13:6, 13:7, 13:9, 13:18, 14:16, 14:24, 16:18, 18:22, 18:24, 20:23, 20:25, 21:3, 23:4, 23:6, 24:1, 24:8, 24:20, 24:25, 28:15, 28:19, 31:9, 32:3, 34:4, 34:11, 35:19, 36:23, 37:19, 37:24, 38:16, 39:4, 39:7, 39:14
**restore** [7] - 18:18, 18:25, 22:20, 25:22, 33:25, 37:12, 37:18
**restored** [3] - 10:17, 16:9, 37:13
**restoring** [2] - 9:23, 25:4
**review** [3] - 3:14, 4:13, 39:23
**Rinke** [1] - 1:22
**rip** [1] - 25:14
**risk** [2] - 7:16, 38:12
**RMR** [1] - 41:13
**rough** [1] - 12:15
**route** [2] - 26:12, 37:7
**routed** [1] - 14:17
**rule** [1] - 21:13
**runoff** [1] - 25:15

**S**

**Sand** [1] - 5:10
**satisfied** [1] - 30:12
**scenario** [2] - 28:25, 29:10
**scenarios** [1] - 28:24
**scheduled** [1] - 3:4
**Schreier** [1] - 1:16
**screen** [3] - 8:1, 12:1, 15:25
**SD** [4] - 1:12, 1:17, 1:20, 41:15
**season** [1] - 32:22
**seated** [1] - 39:21
**section** [1] - 10:11
**sections** [1] - 12:4
**see** [5] - 17:24, 27:4, 28:9, 36:12, 37:14
**seeing** [2] - 26:10, 32:21

**seek** [1] - 32:19
**seeking** [2] - 36:20, 36:22
**sense** [1] - 19:5
**sent** [1] - 36:17
**sentence** [6] - 4:1, 37:15, 38:1, 39:10, 39:20
**SENTENCING** [1] - 1:14
**sentencing** [5] - 3:5, 4:14, 20:21, 33:14, 35:15
**separating** [1] - 13:23
**September** [3] - 32:6, 32:17, 32:23
**seriously** [1] - 11:23
**Service** [6] - 5:7, 5:14, 9:19, 15:15, 28:8, 36:7
**set** [4] - 33:11, 33:18, 34:13, 41:10
**seven** [2] - 16:3, 28:12
**severe** [1] - 27:7
**shall** [1] - 38:21
**shallow** [1] - 10:24
**show** [3] - 8:1, 10:7, 15:11
**showing** [1] - 15:25
**shown** [2] - 11:25, 34:18
**side** [4] - 7:9, 8:5, 16:23, 40:4
**sides** [1] - 31:13
**sign** [3] - 30:17, 30:18, 30:25
**sign-off** [1] - 30:17
**significant** [1] - 9:12
**simply** [2] - 21:22, 28:2
**sincerely** [1] - 34:7
**Sioux** [4] - 1:12, 1:17, 1:20, 41:15
**site** [10] - 7:14, 7:18, 7:19, 14:2, 21:19, 21:23, 22:15, 26:20, 28:1, 34:23
**sites** [1] - 26:25
**sits** [1] - 15:9
**situation** [2] - 35:14, 35:24
**situations** [2] - 18:1, 32:11
**six** [3] - 9:20, 16:3, 36:14
**slightly** [2] - 17:12, 17:25
**small** [1] - 37:21

**snow** [2] - 32:12, 33:7
**snowed** [1] - 33:6
**Soil** [2] - 5:21, 22:19
**soil** [5] - 13:19, 23:15, 23:18, 26:2, 27:22
**someone** [1] - 29:22
**somewhat** [1] - 12:25
**soon** [3] - 13:14, 32:15, 33:13
**sooner** [1] - 32:19
**sounds** [1] - 27:21
**SOUTH** [2] - 1:2, 41:1
**south** [2] - 22:11, 37:3
**South** [4] - 10:4, 10:5, 21:12, 37:4
**SOUTHERN** [2] - 1:3, 41:2
**southwest** [4] - 21:25, 22:11, 28:1, 30:9
**special** [6] - 4:8, 37:22, 38:15, 39:1, 39:4, 39:8
**specific** [2] - 26:10, 26:14
**specifically** [1] - 27:4
**spent** [1] - 34:5
**spot** [1] - 11:18
**spring** [3] - 10:20, 32:8, 33:5
**SS** [1] - 41:1
**St** [2] - 1:23, 1:24
**staff** [2] - 5:18, 7:15
**stand** [2] - 30:11, 37:25
**standard** [2] - 22:18, 38:13
**start** [4] - 10:23, 12:23, 17:1, 23:19
**state** [4] - 5:3, 31:5, 38:1, 38:2
**State** [1] - 38:9
**statement** [2] - 4:14, 6:23
**States** [9] - 3:5, 3:10, 5:6, 6:1, 15:15, 38:22, 39:1, 41:3, 41:14
**STATES** [3] - 1:1, 1:5, 41:1
**status** [2] - 19:9, 25:12
**statutory** [1] - 38:4
**still** [1] - 12:19
**stop** [2] - 21:15, 23:7

**stopped** [1] - 10:21
**stopping** [1] - 27:9
**Street** [1] - 1:23
**strenuously** [1] - 34:15
**sub** [1] - 13:23
**sub-topsoil** [1] - 13:23
**subject** [3] - 28:19, 31:9, 38:17
**submitted** [6] - 6:7, 6:25, 20:23, 24:21, 25:7, 36:23
**substance** [2] - 38:10, 38:12
**substantial** [2] - 7:16, 24:13
**substantially** [2] - 11:15, 22:15
**successful** [1] - 11:5
**suffer** [1] - 25:14
**sufficient** [1] - 37:16
**suggestion** [1] - 31:7
**Suite** [1] - 1:23
**summary** [1] - 20:17
**supervised** [1] - 4:2
**surface** [2] - 9:14, 10:23
**Survey** [1] - 6:1
**suspended** [1] - 38:11
**swale** [1] - 21:14
**sworn** [1] - 4:24
**system** [3] - 12:21, 14:18, 19:24
**systems** [2] - 9:4, 9:10

**T**

**technique** [6] - 7:21, 10:2, 11:16, 11:17, 12:20
**ten** [1] - 16:19
**tens** [1] - 35:2
**term** [3] - 20:2, 38:7, 38:23
**terms** [2] - 17:12, 19:21
**testified** [3] - 4:24, 5:11, 22:24
**TESTIMONY** [1] - 41:10
**testimony** [7] - 4:19, 23:14, 24:14, 24:21, 27:6, 32:15, 36:13
**testing** [1] - 38:11
**THE** [55] - 3:4, 3:13, 3:17, 3:21, 3:24, 4:13,

4:21, 6:12, 6:17, 6:21,
15:21, 15:23, 16:13,
18:17, 18:21, 18:23,
18:24, 19:8, 19:11,
19:12, 19:13, 19:15,
19:20, 20:3, 20:6,
20:8, 20:10, 20:12,
20:14, 20:19, 24:23,
25:23, 26:13, 28:13,
28:18, 29:5, 29:16,
29:20, 30:21, 31:7,
31:16, 31:22, 31:25,
33:1, 33:4, 35:21,
35:23, 36:2, 36:25,
39:13, 39:17, 39:20,
40:2, 40:3, 40:8

**themselves** [1] -
9:12
**theoretically** [1] -
12:19
**thinking** [1] - 7:11
**thousands** [1] - 35:2
**throughout** [1] - 11:2
**tile** [79] - 6:4, 7:7,
7:10, 8:5, 8:7, 8:11,
8:12, 8:16, 8:20, 8:22,
8:24, 9:4, 9:7, 9:10,
9:11, 9:13, 9:17, 9:25,
10:8, 10:11, 10:14,
11:13, 11:14, 11:18,
11:19, 12:11, 12:19,
12:22, 14:17, 14:18,
14:19, 16:20, 17:4,
17:9, 17:10, 17:11,
17:13, 17:14, 17:19,
17:22, 17:23, 18:4,
18:9, 18:13, 18:22,
19:1, 19:17, 19:22,
19:23, 21:19, 21:21,
22:11, 22:17, 22:22,
23:7, 23:22, 24:5,
24:9, 25:6, 25:11,
25:13, 25:24, 26:7,
26:15, 26:25, 27:2,
27:5, 27:8, 27:10,
27:12, 27:14, 27:15,
27:18, 35:3, 36:16
**tiled** [2] - 17:5, 24:16
**tiling** [1] - 22:10
**timing** [3] - 13:12,
22:24, 31:19
**TO** [2] - 2:1, 2:9
**today** [2] - 30:24,
39:25
**top** [2] - 13:15, 23:18
**topsoil** [3] - 13:23,
23:16
**touch** [2] - 30:16,
30:18
**touched** [1] - 22:2

**trackhoe** [1] - 12:3
**tract** [2] - 7:9, 10:21
**tradeoff** [1] - 23:25
**transcript** [2] - 41:5,
41:5
**treated** [1] - 8:19
**trenches** [1] - 13:16
**trial** [6] - 5:11, 21:9,
21:24, 26:19, 36:13,
37:9
**trolley** [1] - 12:21
**trouble** [1] - 33:20
**true** [1] - 41:5
**try** [7] - 25:3, 26:5,
33:12, 33:22, 36:8,
36:10, 36:11
**trying** [4] - 11:17,
26:12, 28:23, 37:10
**two** [5] - 6:19, 8:12,
9:7, 10:6, 11:3
**tying** [1] - 14:18
**typically** [1] - 30:19

## U

**U.S** [9] - 1:11, 1:16,
1:19, 28:7, 28:13,
28:20, 31:10, 37:10,
38:17
**ultimately** [3] - 6:8,
7:12, 7:22
**unclear** [1] - 29:11
**under** [3] - 21:12,
22:18, 38:4
**undersoil** [1] - 23:16
**unfrozen** [1] - 26:21
**UNITED** [3] - 1:1,
1:5, 41:1
**United** [9] - 3:5, 3:10,
5:6, 6:1, 15:15, 38:22,
39:1, 41:3, 41:14
**unlawfully** [1] -
38:10
**unless** [1] - 33:25
**unlike** [1] - 22:21
**unresolved** [1] - 29:3
**untiled** [3] - 19:11,
19:12, 19:14
**up** [11] - 4:2, 4:3, 4:4,
4:15, 5:16, 7:12,
14:10, 18:3, 22:8,
27:8, 35:4
**upgrade** [1] - 17:20
**upper** [1] - 10:24
**upstream** [6] - 17:9,
18:9, 22:23, 23:8,
23:22, 27:19
**US** [1] - 1:23
**utilized** [1] - 10:2

## V

**vague** [1] - 25:3
**variety** [1] - 28:11
**verdict** [2] - 5:13,
33:23
**versus** [1] - 26:12
**vested** [1] - 38:5
**victim** [3] - 4:14,
6:14, 6:22
**view** [1] - 29:20
**violate** [1] - 34:6
**violation** [2] - 8:19,
27:18
**violations** [2] - 9:6,
37:17
**vs** [2] - 1:7, 3:6

## W

**waived** [1] - 38:25
**wand** [1] - 12:22
**wants** [2] - 29:7,
33:21
**warranted** [1] - 36:21
**water** [30] - 7:12,
10:23, 11:3, 17:20,
18:2, 18:6, 18:8,
18:11, 19:3, 19:4,
19:18, 19:24, 21:6,
21:12, 21:16, 21:18,
22:2, 22:14, 22:25,
23:3, 23:10, 24:3,
24:9, 26:12, 26:21,
27:10, 27:25, 28:6,
28:9
**Water** [2] - 5:21,
22:19
**waterfowl** [2] - 37:2,
37:6
**watershed** [1] - 18:5
**ways** [2] - 8:14,
28:11
**weather** [4] - 26:21,
32:7, 32:9, 32:10
**weekend** [2] - 33:6,
33:7
**weigh** [1] - 29:23
**Wenzel** [1] - 14:6
**West** [1] - 1:23
**west** [4] - 19:17,
19:24, 21:19, 22:11
**wet** [2] - 32:8, 32:13
**wetland** [37] - 4:15,
5:25, 6:5, 7:13, 8:6,
8:21, 8:22, 9:3, 9:8,
9:23, 10:23, 12:12,
14:9, 16:8, 16:21,

16:23, 17:12, 17:15,
17:19, 17:20, 17:21,
17:22, 17:25, 18:3,
18:5, 18:7, 18:9, 19:3,
19:4, 22:3, 23:8, 25:4,
26:6, 30:15, 36:14,
37:4, 37:13
**Wetland** [14] - 2:15,
5:18, 5:20, 7:8, 14:7,
14:18, 22:1, 22:3,
22:4, 22:5, 22:7,
27:14
**wetlands** [17] - 4:8,
6:4, 8:21, 9:9, 9:10,
9:12, 10:18, 11:3,
18:18, 22:18, 22:20,
22:23, 22:25, 23:19,
23:23, 24:4, 25:22
**WHEREOF** [1] -
41:10
**wildlife** [1] - 5:9
**Wildlife** [24] - 2:15,
5:6, 5:10, 5:14, 6:2,
9:18, 11:4, 14:20,
15:15, 16:7, 21:1,
26:9, 28:8, 28:14,
28:20, 29:25, 30:25,
31:4, 31:10, 34:1,
34:9, 36:7, 37:10,
38:18
**witness** [1] - 4:24
**WITNESS** [7] - 2:1,
6:17, 18:21, 18:24,
19:11, 19:13, 19:20
**Witness** [2] - 2:3,
20:9
**witnesses** [2] -
20:10, 20:12
**worst** [3] - 28:24,
28:25, 29:9
**worth** [1] - 35:25

## Y

**year** [8] - 4:3, 11:1,
11:2, 31:24, 37:1,
37:16, 38:7
**years** [3] - 4:5, 7:19,
36:8
**yellow** [2] - 27:9,
27:10